**JAN MEYER & ASSOCIATES, P.C.**
Jan Meyer, Esq.
Solomon Rubin, Esq.
1029 Teaneck Road, 2nd Floor
Teaneck, NJ  07666
Phone:  (201) 862-9500
jmeyer@janmeyerlaw.com
srubin@janmeyerlaw.com

*Local Counsel for Lead Plaintiff*
*and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE LINCOLN EDUCATIONAL SERVICES CORP. SECURITIES LITIGATION | Master File No. 10 Civ. 4160-SRC-MAS |
| | Hon. Stanley R. Chesler |
| This Document Relates To:  All Actions | **JURY TRIAL DEMANDED** |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1.     Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.  Lead Plaintiff's information and belief are based upon, among other things, Lead Counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, and information from confidential sources. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

2.     This is a federal class action on behalf of purchasers of the common stock of Lincoln Educational Services Corp.  ("Lincoln" or the "Company") between March 3, 2010 and August 4, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

3.     Lincoln is referred to by the U.S. Department of Education ("DOE") as a for-profit school.  For-profit schools offer students certificates and/or degrees after preparing them for employment in a trade.  These schools typically receive a large amount of their tuition payments from federal financial aid.  Accordingly, for-profit schools are subject to regulation by the U.S. Government, which can prohibit students receiving federal financial aid from attending a for-profit school that does not meet the Government's requirements.

4.     For-profit schools have been the subject of scrutiny by Congress, the Government Accountability Office, and the DOE.  As a result, the DOE proposed additional rules for schools that receive federal loan money to "help ensure that career college and training programs use federal student aid to prepare students for success."  The DOE rules, among other things, hold for-profit schools accountable for high student loan default rates and excessive student debt.

5.     Lincoln recognized that because there is a strong correlation between students who have not completed high school and higher student loan default rates, it took steps to cull these students from its rolls in anticipation of the new DOE rules.

6.     These steps would affect student start growth.  In 2009, Lincoln had student start growth of 26.7%, but despite interest in Lincoln programs, in 2010 Lincoln told investors to expect only 13% to 15% student start growth for the year.  Lincoln said this immediate cut in student start growth was the result of its decision to increase admission test scores for students without a high school diploma, also known as Ability to Benefit ("ATB") students, and to create

2

orientation programs to reduce ATB enrollments.  Defendants expressed confidence in its new, lower student start growth, telling investors that it factored ATB reductions into its current forecasts and that it had already implemented its new restrictions on ATB admissions.

7.      Defendants, however, concealed from investors that the Company knew its measures to exclude ATB students had decimated ATB student starts during the Class Period. Moreover, though Lincoln led investors to believe that ATB student starts were being managed down, internally, the Company still expected approximately 66% of its student start growth to come from new ATB student starts on top of replacing its current ATB population.

8.      After just two quarters of implementing its protocol for increasing admission requirements for ATB students, the Company reported zero student start growth, stating that reducing ATB enrollments accounted for two thirds of the lack of student start growth.  The Company also revised its student start growth rate to zero for the rest of the year and reduced revenue expectations.

9.      As a result of Defendants' corrective disclosure, the price of Lincoln stock fell approximately $4.30, or 20%, in a single trading day, on unusually high trading volume. Though, prior to revealing the truth, David F. Carney, the Company's Executive Chairman and Chairman of the Board of Directors, received over $3 million in proceeds from insider stock sales.  He has since retired.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Lincoln maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

14.     Plaintiff Richard A. Arons was appointed Lead Plaintiff on behalf of himself and the putative Class pursuant to the Court's Order entered November 30, 2010.  Lead Plaintiff purchased the common stock of Lincoln at artificially inflated prices during the Class Period and has been damaged as a result of the disclosure of the truth alleged herein.

15.     Defendant Lincoln is a corporation organized under the laws of the State of New Jersey.  The Company maintains its principal place of business at 200 Executive Drive - Suite 340, West Orange, NJ 07052, and is publicly traded on the Nasdaq under symbol LINC.  Lincoln provides career-oriented, post-secondary education services in the United States.  It offers degree and diploma programs for high school graduates and working adults in health sciences, automotive technology, skilled trades, hospitality services, and business and information technology.  As of December 31, 2009, the Company reported 29,340 students enrolled in its programs.

16.   Defendant David F. Carney ("Carney") was Executive Chairman and Chairman of the of the Board of Directors of the Company during the Class Period.  Defendant Carney retired from the Company effective December 31, 2010.

17.   Defendant Shaun E. McAlmont ("McAlmont") is, and during the Class Period was, President and Chief Executive Officer of the Company.

18.   Defendant Cesar Ribeiro ("Ribeiro") is, and during the Class Period was, Chief Financial Officer, Principal Accounting and Financial Officer, and Senior Vice President of the Company.

19.   Defendants referenced above in ¶¶ 16-18 are referred to herein as the "Individual Defendants."

20.   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lincoln's quarterly and annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material, non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading.  The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

21.   Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Lincoln common stock by

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Lincoln's business, operations, management and the intrinsic value of Lincoln common stock; (ii) enabled Defendants to artificially inflate the price of Lincoln shares; (iii) enabled Defendant Carney to sell millions of dollars of his Lincoln shares while in possession of material, adverse non-public information about the Company; and (iv) caused Lead Plaintiff and other members of the Class to purchase Lincoln common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

22.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased common stock of Lincoln between March 3, 2010 and August 4, 2010, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of the Individual Defendants' immediate families, and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lincoln common shares were actively traded on the Nasdaq. As of May 4, 2010, the Company had over 26.044 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands, of members in the putative Class. Record owners and other members of the Class may be identified from records maintained by Lincoln or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

25.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations, and management of Lincoln; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually seek redress for the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**A.      Lincoln and For-Profit Schools**

28.     Lincoln provides career education and training.  Lincoln represents that its schools "are committed to providing students with the quality, hands-on skills and training they need to succeed in an ever-changing employment landscape."  http://www.lincolnedu.com/about.

29.     According to Lincoln's 2009 SEC Form 10-K (the "2009 10-K"), Lincoln offers degree and diploma programs in five areas of study:  automotive technology, health sciences, skilled trades, business and information technology, and hospitality services.  Lincoln operates 43 campuses in 17 states under the following brands:  Lincoln College of Technology, Lincoln Technical Institute, Lincoln College Online, Nashville Auto-Diesel College, Southwestern College, Euphoria Institute of Beauty Arts and Sciences, Lincoln Culinary Institute, Baran Institute of Technology, Briarwood College, and Clemens College.

30.     The 2009 10-K states that approximately 81% of Lincoln's revenue is derived from federal financial aid funds pursuant to Title IV of the Higher Education Act ("HEA"), as administered by the DOE.  In order for Lincoln's students and Lincoln to obtain and accept financial aid, Linclon must be approved by the DOE and receive accreditation.  Accordingly, Lincoln's business is highly regulated.

**B.      Regulators Require More Accountability from Lincoln and For-Profit Schools**

31.     In October 2009, the DOE published proposed new regulations under the HEA. The proposed regulations covered a broad range of topics including requirements concerning default rates on loans issued pursuant to Title IV.  These rules were to go into effect July 1, 2010, with certain exceptions.

32.    In November 2009, the DOE convened two negotiated rule making committees to develop new regulations concerning integrity and other issues.  According to Lincoln's 2009 10-K, the topics included:

> the definition of high school diploma for the purpose of establishing institutional eligibility to participate in the Title IV programs and student eligibility to receive Title IV aid, ability to benefit students, misrepresentation of information provided to students and prospective students, incentive compensation, state authorization as a component of institutional eligibility, gainful employment in a recognized occupation, the definition of a credit hour, agreements between institutions of higher education, verification of information included on student aid applications, satisfactory academic progress, monitoring grade point averages, retaking coursework, return of Title IV funds with respect to term-based programs with modules or compressed courses and with respect to taking attendance, and the timeliness and method of disbursements of Title IV funds.

33.    The proposed regulations would also further regulate incentive compensation and require compliance with the DOE's mandate to prepare students for "gainful employment."  The 2009 10-K stated that the new proposed definition of gainful employment required schools "to meet a standard under which the average student annual loan repayments cannot exceed eight percent of a student's starting annual income as calculated under a regulatory formula, or that the educational programs meet other alternative thresholds."

34.    These rules were geared to make for-profit schools accountable to both students and taxpayers.  The DOE had recognized that debt loads and defaults had grown rapidly at for-profit schools as a result of students not being positioned to earn enough to pay their obligations. The rules put pressure on Lincoln to enroll the best qualified students who had a good chance of success in both school and of obtaining gainful employment.

**C.      Lincoln's Student Start Rates and ATB Students**

35.     Historically, Lincoln has had an open enrollment policy.   Lincoln provides degrees to traditionally underserved groups, including minorities and low income students. Many of these students seek a degree at Lincoln without having obtained a high school diploma.

36.     The DOE and Lincoln use the term ATB students to describe students that are admitted to secondary education programs without a high school diploma.   According to Lincoln's 2009 10-K:

> Under certain circumstances, an institution may elect to admit non-high school graduates, or "ability to benefit," students, into certain of its programs of study. In order for ability to benefit students to be eligible for Title IV Program participation, the institution must comply with the ability to benefit requirements set forth in the Title IV Program requirements.   The basic evaluation method to determine that a student has the ability to benefit from the program is the student's achievement of a minimum score on a test approved by the DOE and independently administered in accordance with DOE regulations. The HEOA provisions also permit students to demonstrate their ability to benefit and become eligible to receive Title IV funds upon satisfactory completion of six credit hours or the equivalent coursework.

37.     Statistically, ATB students are less likely to finish a program, achieve a degree/certificate at a secondary school, become gainfully employed, and/or pay back student loans.  As a result, DOE regulations prohibit ATB students from constituting 50% or more of the total enrollment of any school.

38.     During the Class Period, Lincoln did not allow all its schools to accept ATB students.  According to Lincoln's 2009 10-K, Lincoln permits enrollment of ATB students at just over half of its 43 schools.   Additionally, Lincoln has told investors both during and after the Class Period that ATB students account for approximately 11% to 12% of its total student population.

10

**D.      Prior to the Class Period, Lincoln Targeted ATB Students for Growth**

39.     Lincoln targeted ATB student enrollments in markets where its schools accepted ATB students.  To drum up ATB student interest, Lincoln ran media campaigns telling potential ATB students:  "No high school diploma or GED?  We may be able to help!"  Lincoln then suggested that the potential ATB student request more information or make an appointment with one of Lincoln's admission counselors.

40.     At that time, Lincoln accepted ATB students regardless of their likelihood of success.  According to Confidential Witness 1, a former Assistant Executive Director with oversight of multiple Lincoln Technical Schools between January 2006 through July 2009, whose responsibilities included assisting the Regional Executive Director in running quarterly campus meetings and quarterly regional meetings, through July 2009, Lincoln's corporate-based "admissions policies were horrific.  It was a mess.  They would just take anybody in regardless of whether or not the person was capable of completing the program [except for the LPN program]."

41.     Indeed, the focus of the Company was on student starts, rather than admission qualifications.  According to Confidential Witness 2, a former registrar at Lincoln College of Technology from 2006 through October 2010, who oversaw 400-plus students' academic and attendance records, and managed and maintained reports on a daily basis while supporting managers, supervisors, faculty, and staff with administrative and clerical support, the overriding focus among admissions and education officials was "getting that start number."  Every attempt was made to keep enrollees in the school's programs for the first five or six days of the new term because if they withdrew after that, the loss wouldn't be counted against official start numbers. Students who were no shows or who were moving toward withdrawing in the first few days would receive constant follow-up in phone calls and messages by the campus' Director of

Education, admissions officials and various instructors.  Because "[i]f any student made it past the first five or six days, they were considered (to be) in the population," and if they subsequently withdrew they were categorized as "drops."

**E.    Lincoln Informed Investors That It Would Decrease ATB Student Starts**

42.    On the first day of the Class Period, March 3, 2010, Lincoln released its Fourth Quarter and 2009 Year End Results.  Lincoln stated that it had seen tremendous growth in student starts.  For the year ending December 31, 2009, Lincoln had increased student starts "by 37.2% as compared to the year ended December 31, 2008.  On a same school basis, student starts increased 26.7% as compared to the year ended December 31, 2008."

43.    In Lincoln's March 3, 2010 conference call with investors, Defendant McAlmont indicated that Lincoln was positioned to achieve similar results in 2010.  Lincoln, however, stated that it would cut its expected student start rates for 2010 by approximately half from the student start rates achieved in 2009.  For the full year 2010, Lincoln expected student start growth of only 13% to 15% over full year 2009 student starts.

44.    Lincoln lowered its expected student start rate because it planned to exclude weaker ATB students from its schools in 2010.  Defendants Carney and McAlmont stated in Lincoln's first quarter earnings release and conference call that it changed its admission practice by increasing required test scores for ATB students and requiring a pre-admission/orientation program.

45.    Lincoln's decision to limit ATB students was a direct result of the DOE's new rules.  Decreasing the ATB population would make it easier for Lincoln to comply with the DOE's proposed debt rates and gainful employment definition by having enrolled students who were better positioned for success.

46.     On May 5, 2010, Lincoln reported its First Quarter 2010 financial results. Lincoln announced that its student start rate for the first quarter grew by 19.3% over the First Quarter of 2009.  Defendant Carney stated, "[w]e continued to experience healthy demand for our programs and early indications are that our important high school season is tracking ahead of last year.  We expect these trends will position us well to continue our strong momentum in 2010 and beyond."

**F.     Lincoln Assured Investors That Measures to Restrict ATB Students Would Not Affect Student Starts**

47.     On May 5, 2010, the Company raised its earnings outlook for 2010 from what it had announced on March 3, 2010.  Lincoln, however, kept its student starts the same as announced on May 5, 2010.  Defendant Carney stated:

> We continue to expect student starts to grow 13 to 15 percent this year.  Our strong increase in student starts during the last several quarters allowed us to take a more selective approach to our admission standards.  This approach was reflected in our prior outlook.

48.     Defendant Carney also assured investors that not only had the new restrictions on ATB admissions been reflected in the Company's expected student start rate of 13% to 15% over 2009 student starts, but also that student start growth will not be reduced immediately by the Company's program to cut ATB student starts.  Defendant Carney stated, "[o]ver time we expect these actions will reduce our start growth, but will result in higher retention, improved student outcomes and higher placement rates, as well as lower bad debt expense and default rates."

49.     Lincoln's May 5, 2010 earnings release also stated that "[f]or the second quarter of 2010, . . . .  Student starts are expected to grow 8 to 10 percent."

50.     During the May 5, 2010 Earnings Conference Call, Defendant Carney further assured investors that tightening ATB admission standards was "factored . . . into" its lower student start rate forecasts for 2010.  Defendant Carney stated that:

And now, let me provide a couple of comments for helpful context.  Inquiries for our programs remained healthy.  Our strong student starts during the last several quarters has led us take a more selective approach to our admissions standards.  We expect these actions will reduce our start growth over time, but improve retention, student outcomes, and placement rates, as well as ultimately reduce bad debt expense and default rates.  We implemented these efforts at the beginning of the year and therefore factored them into our 2010 outlook that we provided on our March 3 earnings call.

51.     Defendant McAlmont told investors that the loss of ATB students would be offset by growth in high school recruitment.  Defendant McAlmont also told investors that high school recruiting was ahead of normal based on "all the visibility we have."

52.     Analysts asked numerous questions concerning the effect changes in ATB admissions had on Lincoln's student start rate.  Defendants continued to assure investors that changes in ATB admissions would not affect Lincoln's expected student start growth in the near term, stating that student start rates will go down "over time" having a gradual effect on student starts and again stating that the effects of the ATB restrictions were "factored . . . into" the student starts for 2010.

53.     In one of the exchanges between the Individual Defendants and analysts, Defendant Carney addressed an analyst's concern about the correlation between lower student starts and the Company's restriction on ATB recruitment:

**Amy Junker** - *Robert W.  Baird & Co., Inc.  - Analyst*

Good morning.  I just have a couple of quick follow-ups.  One just going back to the starts for the second quarter, I just want to clarify that the deceleration to the 8% to 10%, is that entirely due to your more selective admission standards?  Or are you starting to see perhaps some headwinds as the economy is stabilized and tougher comparisons?

**David Carney** - *Lincoln Educational Services - Executive Chairman*

Amy, this is Dave.  No, I don't – frankly, we have really no evidence of any slow down.  I mean the increase are still strong.  Part of it is being more selective with respect to the ATB students.  Part of it is the comps.  Part of it is there's always some movement, and I think you can probably recall from year-to-year, between

high school starts in the latter part of the second quarter versus the third quarter. So that's basically all it is. We're still seeing strength across all of the program offerings. And frankly, that's pretty much what we assumed when we prepare the original guidance that led to the 13% to 15% for the year.

54.     Lincoln also assured analysts that all the ATB recruiting restrictions have been

implemented and will be carried forward in Lincoln's business for the rest of the year:

**Scott Schneeberger** - *Oppenheimer & Co. - Analyst*

Thanks. Just one more follow-up on the second quarter to third quarter starts. Will you be doing anything differently between those two quarters with regard to new admission standards?

**Shaun McAlmont** - *Lincoln Educational Services - President & CEO*

No, everything we've talked about has already been implemented and no other changes to admission standards. I think the only thing that we'll see internally is a more aggressive approach in our high school marketing process. But those in school efforts and also the high school media efforts as well.

**G.     Lincoln Concealed That Two Thirds of Student Start Growth Depended on ATB Starts**

55.     The amount of ATB students that were projected as part of the student starts was

not broken out in Company press releases during the Class Period. However, for the year 2009,

investors were told that that ATB students amounted to approximately 11% to 12% of Lincoln's

overall population. Accordingly, given the short term nature of Lincoln's programs, in order for

ATB students to maintain a consistent percentage of the student population, new ATB student

starts were at 11% or 12%.

56.     At the end of the Class Period, during the August 5, 2010 conference call,

Defendant McAlmont confirmed that the rate of ATB students remained at 11% to 12% in 2010:

**Scott Schneeberger** - *Oppenheimer & Co. - Analyst*

Thanks. Just following up on that thought, the only students being considered for orientation, that roughly 11% that are ATB currently, would that be expanded going forward? And how is that baked into the guidance?

**Shaun McAlmont** - *Lincoln Educational Services - President and CEO*

15

Today, the students who are automatically put into that pre-orientation are the high-risk students, the 11% or 12%. In the case that a local school feels that they need a student to go through the pre-orientation for any other reason, they can do that today, and we've seen that happen in some of our schools. But all of that is baked into our forecast for Q3 and Q4.

57.     Additionally, on that same day, Defendant McAlmont stated that two thirds of student start growth for the second quarter was expected to come from ATB growth. Defendant McAlmont stated:

But I'll just say that the way we looked at the impact in the second quarter and the impact on the second half of the year is that there are a couple of pieces. The first piece relates to the standards that we are increasing. One piece of that is the test score, and the other piece is the pre-orientation, and that is about two thirds of the impact.

The other third we're anticipating – and it's based on our current experience with our June starts – is that there is some affordability effect, and that's the other third of the impact.

58.     Thus, when Lincoln forecasted eight percent growth in the student start number over the second quarter of 2009, unbeknownst to investors, approximately five percent of that number was expected from ATB students. Moreover, this approximate five percent increase in ATB students was on top of the Company's normal ATB enrollment of 11% to 12%.

59.     Lincoln could not achieve its projected student start growth for 2010 by cutting two thirds of ATB student start growth.

## H.     Lincoln Concealed That Restrictions on ATB Student Enrollment Immediately and Materially Decreased Student Start Growth

60.     Lincoln's pre-admission orientations were designed to discourage ATB students who would not likely finish the program. This was a change in business practice from when ATB students would be admitted, included as a student start, and then later drop out of the school as stated by Confidential Witness 2. *See* ¶ 41.

61.     According to Confidential Witness 1, Lincoln used ATB tests, such as the Wonderlic test, which had a high failure rate.  Confidential Witness 1 stated that even before Lincoln increased its pass rates, only 30% of the ATB candidates passed the admission tests. Confidential Witness 3, a former Admissions Coordinator at Lincoln Technical Institute between 2007 and June 2010, whose responsibilities included organizing all admissions documentation for over one thousand students and distributing computerized leads to sales representatives, stated that close to 35% of ATB students failed the admission test even before the passing grade was increased.

62.     Defendants knew that tightening ATB admission standards was immediately decreasing student start rates.  Defendants monitored student starts through the use of software such as CampusVue.  This tracking system allowed Defendants to monitor student start rates, even on a daily basis.

63.     As Confidential Witness 3 noted, he[1] generated daily, weekly and monthly reports from the CampusVue database for review by the local director of admissions and executive director on the status of enrollments, student starts and drops.

64.     According to Confidential Witness 4, a former admissions representative for Lincoln Technical Institute from October 2008 to August 2010, whose responsibilities included providing information to all potential students about the programs, including entrance requirements, curriculum and academic standards, all enrollment and student start data were updated daily into the CampusVue database.  A student's position was recorded in the program at every step from the sequence of recruitment lead to application, financial aid status, enrollment, start, attendance, grades, graduation and job placement.  A separate cumulative

---

[1] In this instance, "he" is used as a gender neutral pronoun to protect the confidentiality of the witness.

report could be generated on any one of these categories.  The database was programmed to generate a "Daily Report," which was reviewed by the school's officials, including its Director of Admissions.

65.     Additionally, these declines were more apparent than at other for-profit schools because Lincoln had short-term programs.  Lincoln's business model depended on frequent new student starts.  As stated on its website, when answering questions about enrollment, "Unlike a 4-year college with only 2 starts per year, all of our programs start on an on-going basis throughout the year."  Confidential Witness 3 stated that some programs had up to six starts a month.

66.     The expected student start rates were known to be false when made. Additionally, Defendants misled investors by indicating that the changes in ATB admissions would have a gradual effect on student starts and that measures to restrict ATB students were fully implemented.

## MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

67.     On March 3, 2010, Defendants issued a press release announcing results for the full year 2009, ended December 31, 2009, and provided guidance for fiscal year 2010 and for the second quarter 2010.  The release stated, in part:

2010 Guidance

Revenue of $645 million to $655 million, up 17% to 19% over 2009.

Diluted EPS of $2.40 to $2.50, representing growth of 32% to 37% over 2009.

Increase in expected student starts of 13% to 15% over 2009.

68.     Defendants' statement, "2010 Guidance . . . .  Increase in expected student starts of 13% to 15% over 2009" was materially false and misleading when made because Defendants knew or recklessly disregarded that this guidance had no basis in fact.  At the beginning of 2010,

Defendants began implementing measures to restrict the enrollment of ATB students that would have, and did have, an adverse impact on Lincoln's ability to achieve student start rates of 13% to 15% over 2009's student starts.  As alleged, Defendants designed pre-admission programs to limit and discourage ATB student starts and excluded ATB students from admission by increasing the required ATB entrance exam score.  *See* ¶¶ 60-61.  The negative effects of these measures were known to Defendants from the CampusVue database, which tracks student start data on a daily basis.  *See* ¶¶ 62-64.

69.     Defendants' 2010 student start guidance was also materially false and misleading because Defendants concealed from investors the fact that Lincoln largely depended on ATB student start growth to achieve the projected 13% to 15% overall student start growth.  *See* ¶¶ 55-58.  In the August 5, 2010 Earnings Conference Call, Defendants admitted that though they reduced the student start rate from 2009 by approximately half, due to plans to restrict ATB enrollment, over half of the 2010 student start growth was still expected to come from new ATB student start growth.

70.     Defendants' 2010 student start guidance was also materially false and misleading because Defendants knew or recklessly disregarded that as a result of pressure by the DOE, accrediting agencies, and other regulators, Defendants could not aggressively seek enrollment of ATB students to increase the Company's student start rate.  Moreover, Defendants knowingly or recklessly misled investors to believe that the 2010 student start rate forecast was valid and would not be affected by measures to restrict ATB students.  *See* ¶¶ 47-54.

71.     Defendants' statement, "2010 Guidance.  Revenue of $645 million to $655 million, up 17% to 19% over 2009" was materially false and misleading when made because increases in revenue was linked to projected increases in student starts.  For the reasons stated in

paragraphs 68-70 above, the 2010 student start guidance had no basis in fact.  Thus, Defendants

knew or recklessly disregarded that 2010 revenue guidance was materially false and misleading.

72.     On March 3, 2010, Defendants conducted the LINC Q4 2009 Lincoln Educational

Services Earnings Conference Call.  Defendants Carney, McAlmont, and Ribeiro participated in

the call.  Defendant Carney stated in his prepared remarks that:

> For the full year, we expect revenue of $645 million to $655 million, representing
> growth of 17% to 19% over 2009 with student starts increasing 13% to 15% over
> 2009.  We expect diluted earnings per share of $2.40 to $2.50 representing growth
> of 32% to 37% over 2009.

These statements concerning revenue guidance and expected increases in student starts were

materially false and misleading for the same reasons stated above in paragraphs 68-71.

73.     Also during the March 3, 2010 conference call, Defendant McAlmont stated:

> I will just say that our approach on looking at entrance requirements is a gradual
> one.  **We look at offsetting and so if we tighten our entrance requirements, it
> may, for example, affect ATB students and lessen that population over time.
> But we offset that with an increase in our recent high school grad population.**
> And we feel that that particular offset gives us better outcomes, a student that is
> more committed and it really does relieve the burden on some of our entrance
> processes.  [Emphasis added.]

74.     The bolded statement in the above paragraph 73 was materially false and

misleading because tightening entrance requirements had a direct effect on ATB student starts.

Additionally, Defendant McAlmont's representation that Lincoln would "offset [ATB losses]

with an increase in our recent high school grad population" was materially false and misleading

because Lincoln did not intend to offset losses of ATB students with recent high school

graduates.  *See* ¶¶ 55-58.  Defendant McAlmont admitted in the August 5, 2010 Earning

Conference Call that the guidance was based on higher numbers of ATB students and not high

school graduates as only a third of student start growth was expected to come from high school

graduates, two thirds was expected to come from expected ATB student starts.

20

75.     On May 5, 2010, Defendants issued a press release announcing record setting results for the first quarter of 2010, ended March 31, 2010.   Commenting on the results, Defendant Carney stated:

> "We are raising our earnings outlook for 2010," said Mr. Carney.   **"We continue to expect student starts to grow 13 to 15 percent this year.**  Our strong increase in student starts during the last several quarters allowed us to take a more selective approach to our admission standards.  **This approach was reflected in our prior outlook.  Over time we expect these actions will reduce our start growth,** but will result in higher retention, improved student outcomes and higher placement rates, as well as lower bad debt expense and default rates."

Lincoln's press release also stated:

> For the full year 2010, we now expect revenue to range from $650 to $655 million.  **Student starts are expected to increase 13 to 15 percent.**  Diluted earnings per share are expected to range from $2.50 to $2.60, which would be an increase of 37 to 43 percent from the $1.82 we earned in 2009. [Emphasis added.]

> For the second quarter of 2010, we expect revenue to range from $151 to $153 million.  **Student starts are expected to grow 8 to 10 percent.**  Diluted earnings per share are expected to range from $0.42 to $0.45, which would be an increase of 56 to 67 percent from the $0.27 earned in the second quarter of 2009.

76.     Defendant Carney's statements that:  "[w]e continue to expect student starts to grow 13 to 15 percent this year"; "[f]or the second quarter 2010, . . . .  Student starts are expected to grow 8 to 10 percent"; and "[o]ver time we expect these actions will reduce our start growth, . . ." were materially false and misleading when made because Defendants knew or recklessly disregarded that this guidance had no basis in fact.  As alleged, at the beginning of 2010, Defendants began implementing measures to restrict enrollment of ATB students that would have, and did have, an adverse impact on Lincoln's ability to achieve its full year and second quarter expected student start rates.  As also alleged, Defendants designed pre-admission programs to limit and discourage ATB student starts, and excluded ATB students from admission by increasing the required ATB entrance exam score.  *See* ¶¶ 60-61.  The negative

effects of these measures were apparent to Defendants from the CampusVue database, which tracks student start data on a daily basis.  *See* ¶¶ 62-64.

77.    Defendants' student start guidance was also materially false and misleading because Defendants concealed from investors the fact that Lincoln largely depended on ATB student start growth to achieve overall student start growth for the year and for the second quarter.  *See* ¶¶ 55-58.  In the August 5, 2010 Earnings Conference Call, Defendants admitted that though they reduced the student start rate from 2009 by approximately half, due to plans to restrict ATB enrollment, over half of the 2010 student start growth was still expected to come from new ATB student start growth.  Defendant McAlmont specifically attributed two thirds of the expected student start growth for the second quarter to ATB student starts.

78.    Additionally, Defendants' statements that "we continue to expect . . . ." and "[t]his approach was reflected in our prior outlook" were materially false and misleading in that Defendants did not fully incorporate the effects of the measures to reduce ATB student starts and missed its projections as a result.  *See* ¶¶ 55-65.

79.    The student start guidance was also materially false and misleading because Defendants knew or recklessly disregarded that as a result of pressure by the DOE, accrediting agencies, and other regulators, Defendants could not aggressively seek enrollment of ATB students to increase its student start rate.  Moreover, Defendants knowingly or recklessly misled investors to believe that the start rate forecast would not be affected by measures to restrict ATB students.  *See* ¶¶ 47-54.

80.    Defendants' statement that "[f]or the full year 2010, we now expect revenue to range from $650 to $655 million . . . "  was materially false and misleading when made because increases in revenue were linked to projected increases in student starts.  For the reasons stated in

paragraphs 76-79 above, 2010 student start guidance had no basis in fact.  Thus, Defendants knew or recklessly disregarded that 2010 revenue guidance was materially false and misleading.

81.     On May 5, 2010, Defendants also conducted the LINC Q1 2010 Lincoln Educational Services Earnings Conference Call.  Defendants Carney, McAlmont, and Ribeiro participated in the call.  In prepared remarks at the start of the call, Defendant Carney stated:

> And now, let me provide a couple of comments for helpful context.  Inquiries for our programs remained healthy.  Our strong student starts during the last several quarters has led us take a more selective approach to our admissions standards. **We expect these actions will reduce our start growth over time,** but improve retention, student outcomes, and placement rates, as well as ultimately reduce bad debt expense and default rates.  **We implemented these efforts at the beginning of the year and therefore factored them into our 2010 outlook that we provided on our March 3 earnings call.**
>
> **Accordingly, we are maintaining our full year student start expectations of 13% to 15% growth and our second quarter outlook is consistent with our annual plan.**  As you know, our third quarter starts represent 40% of our annual starts and a large component are from our high school program.  I'm pleased to report today that our high school recruitment is ahead of both our internal plans and prior year, and Shaun will discuss these actions in our high school recruitment momentarily.  [Emphasis added.]

Defendant Ribeiro stated in his prepared remarks:

> I'll finish my prepared remarks by providing our current outlook for the full year and the second quarter.  **We are raising our earnings outlooks for 2010.  We continue to expect student starts will grow 13% to 15% in 2010.**  Our strong increase in student starts during the last several quarters allowed us to take a more selective approach to our admission standards.  This approach was reflected in our prior outlook.  **Over time we expect these actions will reduce our start growth** but will result in higher retention, improved student outcomes, an higher placement rates, as well as lower bad debt expense for default rates over time.
>
> **For the full year 2010, revenue is expected to range from $650 million to $655 million.  Student starts are expected to increase 13% to 15%.  Student starts are expected to grow 8% to 10%** and diluted earnings per share are expected to range from $0.42 to $0.45, which would be an increase of 56% to 67% from the $0.27 we earned in the second quarter of 2009.  [Emphasis added]

When responding to an analyst question during the call, Defendant McAlmont discussed how lower numbers of ATB students would be offset by high school recruitment:

> As Dave [Carney] mentioned earlier, we're really trying to eliminate the highest risk students from our population ultimately.  Our ATB rate throughout last year was about 12%.  Today it sits at 11% and that will continue to come down.  But I just wanted to also mention, though, regarding this sort of shift to some of the higher risk students that as we mentioned on our last call, **we feel that sort of the offsetting event here is a focus on our high school students and high school recruitment.**  [Emphasis added.]

Also when responding to another analyst question during the call, Defendant McAlmont told

investors regarding restrictions on ATB enrollments:

> **No, everything we've talked about has already been implemented and no other changes to admission standards.**  I think the only thing that we'll see internally is a more aggressive approach in our high school marketing process. But those in school efforts and also the high school media efforts as well. [Emphasis added.]

82.     Defendants' statements concerning expected full year and second quarter student

start rate growth and that Defendants "expect these actions [to reduce ATB student starts] will

reduce our start growth over time, . . ." were materially false and misleading for the reasons set

forth in paragraphs 76-79 above.

83.     Defendants' statements concerning expected full year revenue guidance were

materially false and misleading for the reasons set forth in paragraph 80 above.

84.     Defendants' statements that "[w]e implemented these efforts at the beginning of

the year and therefore factored them into our 2010 outlook that we provided on our March 3

earnings call" and in response to a question regarding measures to reduce ATB student starts that

"[n]o, everything we've talked about has already been implemented and no other changes to

admission standards" were materially false and misleading because Defendants did not

implement these measures across all schools that admitted ATB students at the beginning of the

year or by the date of this conference call.  During the August 5, 2010 conference call, Defendant

McAlmont revealed that these measures were still being implemented.

85.    Additionally, Defendants' statement that "[w]e implemented these efforts at the beginning of the year and therefore factored them into our 2010 outlook that we provided on our March 3 earnings call" was materially false and misleading.   Defendants did not fully incorporate the effects of the measures to reduce ATB student starts and missed its projections as a result.  *See* ¶¶ 55-65.

## THE TRUE OPERATIONAL CONDITION OF
## LINCOLN IS BELATEDLY REVEALED

**A.    Lincoln Reveals That Student Starts Were Flat in the Second Quarter and Revises 2010 Forecasts**

86.    On August 5, 2010, before that day's trading began, the Company announced its second quarter results.  The press release stated:

Second Quarter 2010 Highlights

—    Revenue grew 19.3 percent to $152.8 million from $128.1 million in the prior-year quarter.

—    Operating income rose 71.1 percent; operating profit margin improved to 15.0 percent from 10.5 percent in the prior-year quarter.

—    Diluted earnings per share grew 85.2 percent to $0.50.

—    Average student population rose 17.6 percent.

—    Student starts were essentially flat and reflected actions to raise outcomes.

****

The current regulatory environment has created uncertainty in our sector as the Department of Education has placed a greater emphasis on regulating quality outcomes, student debt levels and overall return on educational investment. While the regulations have yet to be finalized, we believe that the Department's focus on improving outcomes is consistent with our mission of providing students with a quality education and a high return on their investment. Accordingly, we elected to raise our admission standards in the first quarter of 2010 to reduce the percentage of higher risk students in our population. While these actions contributed to starts being essentially flat in the second quarter, we believe that the increased admissions standards will assist us in achieving the Department's overall objectives by improving our graduation and placement rates while also

having a positive impact on our overall population and future profitability by lowering our bad debt and default rates.

****

Outlook

"In light of the current regulatory and economic environment, as well as our actions to reduce the percentage of higher risk students in our enrollment and to raise student outcomes, we are revising our previously issued guidance. We now believe student starts will be essentially flat for the remainder of 2010," said Mr. McAlmont. "For the full year 2010, we now expect revenue to range from $645 to $650 million and diluted earnings per share to range from $2.40 to $2.50, which would be an increase of 32 to 37 percent from the $1.82 we earned in 2009. Student starts are expected to increase approximately 4 percent for the full year."

"For the third quarter of 2010, we expect revenue to range from $165 to $170 million. Diluted earnings per share are expected to range from $0.60 to $0.65, which would be an increase of 20 to 30 percent from the $0.50 earned in the third quarter of 2009."

87.     Additionally, on August 5, 2010, the Company held its LINC Q2 2010 Lincoln Educational Services Earnings Conference Call.  Defendants Carney, McAlmont, and Ribeiro participated in the call. There, Defendant Carney, in direct contradiction to his May 5, 2010 representation that "[o]ver time we expect these actions will reduce our start growth . . . " stated:

In the short term, our new student start growth will be limited by the actions we're taking to raise our student outcomes.  Over time we believe these steps will lead to improved graduation and placement rates as well as lower bad debt and default rates.  These actions contributed to essentially flat starts in the second quarter, and Shaun will discuss our second-quarter start performance momentarily.

88.     During the August 5, 2010 Conference Call, Defendant McAlmont revealed details concerning the program to reduce ATB students and also stated that these actions will effect new student enrollment in the short term:

Now regarding managing risk and our second-quarter start performance, as previously communicated, we continued to take steps to manage the risk profile of our students.  We started at the beginning of the year by no longer allowing high-risk students to enroll in degree programs or nursing.  Toward the end of the first quarter, we raised entrance requirements and took further actions to reduce the number of high-risk students in our population.

26

Our second-quarter start performance was impacted to a great part by these particular actions.  To be specific, we're administering a two-step process to reduce this risk.  As mentioned during last quarter's call, we raised the admissions test scores in certain markets for Ability-to-Benefit students.  We also added pre-start orientation and remediation programs across all institutions for these students, aimed at identifying those who we believe will not complete our program successfully

This two-step process not only assesses academic ability via the admissions test; it assesses students' early motivation and persistence capabilities as well.  Students must achieve all pre-start objectives before officially starting school.  This is the new process for our schools and a critical one focused on early efforts which will impact longer-term outcomes.  It does have the potential to impact start rates while being implemented.   And while these actions will affect new student enrollment in the short term, we feel they will ensure long-term student and company success.

89.    During the question and answer portion of the August 5, 2010 conference call, Defendants revealed for the first time that two thirds of student start growth for the second quarter was expected to come from ATB enrollments, that ATB enrollment remained at approximately 11%, and that high school enrollments did not materialize.

90.    Defendant McAlmont also told investors that "while we implement [restrictions on ATB enrollments], we feel that there will be a start rate impact as we experienced in Q2, and we're forecasting that for the remainder of the year."  This revelation, however, contradicted Defendant McAlmont's May 5, 2010 representation that restrictions on ATB enrollments had "already been implemented."

91.    The question and answer period also revealed additional new information about ATB students, enrollment, and why forecasts were abandoned.   Analysts asked numerous questions in an attempt to clear up confusion created by Defendants' prior misstatements about Lincoln's ATB enrollment restrictions and how ATB students' affected student start growth.  For example:

**Shaun McAlmont** - *Lincoln Educational Services - President and CEO*

27

Gary, this is Shaun.  High-risk students, as we're defining them today, are embedded within our ATB population.  And the growth expectation that we anticipated – the 8% represented about 650 new student starts in the second quarter.

Our decision to raise standards accounted for approximately two thirds of that number.  It's a proactive approach that we're taking to graduate more students and based on where we need to be as an institution in 12 to 24 months.  The increased test score is one component.

To your question, we've also added a pre-start orientation, which we feel is a critical step for us to achieve the persistence necessary for these high-risk students.  And while we implement, we feel that there will be a start rate impact as we experienced in Q2, and we're forecasting that for the remainder of the year.  Now, we do feel that that will level out as this becomes more of a standard operating procedure for the Company.

Outside of the increases in test scores and the pre-orientation, the balance reflects a reduction in start rate from both media and high school, in which our estimation's caused by some economic hardships on students and their families.

And just as a quick example, one of our leading indicators is financial aid packaging, which we attempt to have complete well before a student starts classes.  Our indicators showed that we had a number of these students not start in the month of June.  And I think that that was one of the unexpected circumstances we saw in the quarter

How that will affect us moving forward we factored into our forecast, as Cesar mentioned.  But I think, in all, to answer your question specifically, we added the pre-start orientation again, which we feel is a critical component for early persistence, which leads to longer-term outcomes.

****

**Sara Gubins** - *Banc of America-Merrill Lynch - Analyst*

Hi, thank you.  I had a question about ATB as a percentage of the total, and I'm just trying to understand the lower starts versus your expectations.  If I remember correctly, ATB's about 11%, 12% of your population typically.  Is that right?

**Shaun McAlmont** - *Lincoln Educational Services - President and CEO*

That's right.

**Sara Gubins** - *Banc of America-Merrill Lynch - Analyst*

So was it that pretty much all ATB students coming in either didn't make it through the test or got put into the orientation program?

**Shaun McAlmont** - *Lincoln Educational Services - President and CEO*

No. No. Like I said in my comments, the ATB students or the higher-risk portion of the ATB students affected probably two thirds of that shortfall. I think the ATB students as a percent of total will come down over time, as we said in prior calls. We just haven't quantified what that will be over the next few quarters, and we'll give more indication of that on future calls.

But I think that part of the shortfall, as I mentioned earlier, was affected by affordability, and to the extent of probably one third. Ann this may be a timing issue as some families are taking a slightly longer time to decide on when to start and looking at their financing options. But I will give you just one little indication that we saw on affordability related to the direct lending program.

It has had an interesting impact on parental loans for us, and we're finding a higher level of approval. However – which is positive, but where the parents don't want to take on a loan for whatever reason, whether it's an older dependent child or they've got some economic hardships, the loan can become unappealing. And the real issue here for us is in the case a parent's approved, it disqualifies the student from other forms of Title IV. And so we did see a little bit of an impact regarding affordability in the month of June, and we're looking at that forward in our start forecast as well.

**Sara Gubins** - *Banc of America-Merrill Lynch - Analyst*

Okay. And sorry, just to go back to ATB though, if two thirds of the change was related to ATB, it still sounds to me like almost all of the – or at least a good portion of the ATB students are being required to go through that pre-start orientation.

**Shaun McAlmont** - *Lincoln Educational Services - President and CEO*

Yes, no, I'm sorry. All ATB students are required to go through the pre-start orientation.

. . . . [parties speaking over each other]

The two-part process is that not all ATB students will have the higher test score. That's in certain geographies where we have more ATB students than we feel comfortable, and the outcomes may be challenged. And so we are managing those ATB populations down to an acceptable level. All ATB students, though, will go through the pre-start orientation.

**Sara Gubins** - *Banc of America-Merrill Lynch - Analyst*

Okay, and can you describe the orientation? How long is it, and were they all going through it this past quarter?

**Shaun McAlmont** - *Lincoln Educational Services - President and CEO*

They were all going through it this past quarter.  The orientation is five full and intense days.  The students are required to I guess achieve a number of academic pieces in those five days, and they're required to be present for the full days through the entire week.

Now, in the case that a student shows any weakness in that early persistence or we identify academic challenges, the students will be taken out of the start number – or, I'm sorry, out of the group that's potentially going to start.  And they at this point in time will have an opportunity to go through it again at a future date, and that doesn't guarantee that the student will still be waiting to go through that process.  But in the future we'll have a better indication of those trends as well.

**** 

**Kelly Flynn** - *Credit Suisse - Analyst*

Okay, but I mean, if you said you're kind of just rolling some of these new initiatives out and they'll be kind of fully in place by Q4, why wouldn't there be a bigger hit in Q4 than in Q3?

**Shaun McAlmont** - *Lincoln Educational Services - President and CEO*

I think we've rolled the of these majority out.  And I think the comment related to the fact that some schools have had it a shorter period of time, other schools have been doing it a little longer.  And so the way we're looking at the impact is that the third quarter will be flat in its own right; the fourth quarter will be flat against prior year as well in its own right.  And we're just, again, looking at the impact of the new procedures in addition to some affordability issues that we're seeing out there as well.  But we don't see the fourth quarter being hit any more intensely than the third quarter.

**** 

**Kelly Flynn** - *Credit Suisse - Analyst*

Okay, great.  And then if you could just clarify one other thing, you said that thing about the 650 students I guess that were impacted in the second quarter and then two thirds of that related to some of these initiatives.  Could you just go over that again in more detail, kind of of what was the two thirds, and what's the other third, and anything else related to that?

**Shaun McAlmont** - *Lincoln Educational Services - President and CEO*

Right.  That was the detail.  But I'll just say that the way we looked at the impact in the second quarter and the impact on the second half of the year is that there are a couple of pieces.  The first piece relates to the standards that we are increasing.

One piece of that is the test score, and the other piece is the pre-orientation, and that is about two thirds of the impact.

The other third we're anticipating – and it's based on our current experience with our June starts – is that there is some affordability effect, and that's the other third of the impact:

****

**Scott Schneeberger** - *Oppenheimer & Co. - Analyst*

Thanks.  Just following up on that thought, the only students being considered for orientation, that roughly 11% that are ATB currently, would that be expanded going forward?  And how is that baked into the guidance?

**Shaun McAlmont** - *Lincoln Educational Services - President and CEO*

Today, the students who are automatically put into that pre-orientation are the high-risk students, the 11% or 12%.  In the case that a local school feels that they need a student to go through the pre-orientation for any other reason, they can do that today, and we've seen that happen in some of our schools.  But all of that is baked into our forecast for Q3 and Q4.

92.      As a result of these revelations, Lincoln's stock price fell approximately 20% as investors realized that contrary to Defendants' representations, Lincoln's actions to limit ATB students and otherwise adapt Lincoln's business to the DOE's rules had an immediate and negative effect on Lincoln's business, which were likely to stunt Lincoln's growth for at least the rest of the year.

**B.      Lincoln Continues to Struggle with Fallout from Its Class Period Actions Concerning ATB Students**

93.      On August 10, 2010, the Company reported on Form 8-K, that on the same day it disclosed second quarter results, Lincoln received a request for information from the U.S. Senate Committee on Health, Education, Labor and Pensions concerning its students.  The Company stated:

On August 5, 2010, Lincoln Educational Services Corporation (the "Company") received a request for information from the U.S. Senate Committee on Health, Education, Labor and Pensions in connection with the Committee's review of matters related to for-profit colleges receiving Title IV student financial aid.  In its

request, the Committee stated that it is seeking information and documents from the Company to more accurately understand how the Company uses Federal resources, including how it recruits and enrolls students, sets program price or tuition, determines financial aid including private or institutional loans, tracks attendance, handles withdrawal of students and return of Title IV dollars and manages compliance with the requirement that no more than 90% of revenues come from Title IV dollars. The Committee is also seeking a complete understanding of the number of students who complete or graduate from programs offered by the Company, how many of those students find new work in their educational area, the debt levels of students enrolling and completing programs and how the Company tracks and manages the number of students who risk default within the cohort default rate window.

The information that the Company has been requested to provide includes information relating to the Company's management, operating and financial results, amount of revenue generated from government and private financial aid, student enrollment and completion, tuition and program costs, recruiting, student loan and default management, institutional lending programs, regulatory compliance and other matters.

94.     Reducing ATB student enrollments to comply with DOE rules continues to be a drag on Lincoln's student start rate.  On November 3, 2010, Lincoln announced that during Lincoln's third quarter of 2010, traditionally its largest quarter for student starts, student growth was negative 8.8% over third quarter of 2009 "in part impacted by actions to raise outcomes." The Company also stated that it believes "student start rates will be essentially flat to slightly negative for all of 2010."  The Company told investors that it is managing its business in order to reduce ATB students "to no more than 10% of our overall population in order to improve overall graduation, default and repayment rates."

95.     Also in the November 3, 2010 earnings release, Defendants revised earnings forecasts down as a result of reduced ATB student enrollments.  Defendant McAlmont stated that "[f]or the full year 2010, we now expect revenue to range from $635 to $640 million . . . ." Defendant McAlmont also stated that "[l]ooking forward, we expect that our previous actions will cause our student population and revenues to decrease modestly in 2011 from 2010 levels before gradually recovering in 2012.  We expect that these decreases will create downward

pressure on our margins over the next 18 to 24 months as we implement the aforementioned actions."

## CAUSATION AND ECONOMIC LOSS

96.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Lincoln's stock price and operated as a fraud or deceit on Class Period purchasers of Lincoln's stock by misrepresenting and/or omitting material facts about the Company's quarterly and annual growth prospects. Ultimately, however, when Defendants' prior misrepresentations and omissions and fraudulent conduct were revealed, shares of Lincoln declined – evidence that the prior artificial inflation in the price of Lincoln's shares was eradicated.  As a result of their purchases of Lincoln's stock during the Class Period, and later revelation of the truth, Lead Plaintiff and other members of the Class suffered economic losses, i.e., damages under the federal securities laws.

97.     Defendants presented a misleading image of Lincoln's business and future growth prospects by mischaracterizing and concealing issues with student starts and revenue.  During the Class Period, Defendants repeatedly emphasized the ability of the Company to maintain and sustain its objectives, and report student start rate growth within the range of investors expectations.  These claims caused and maintained the artificial inflation in Lincoln's stock price throughout the Class Period.

98.     On March 3, 2010, after issuing the materially false and misleading statements alleged herein, Lincoln shares increased in value to close at $24.34 per share from closing at $22.49 per share on March 2, 2010.

99.     On May 5, 2010, after issuing the materially false and misleading statements alleged herein, Lincoln shares increased in value to close at $24.99 per share from closing at $24.22 per share on May 4, 2010.

100.    On August 5, 2010, however, investors learned the truth about the Company, and realized or concluded that Defendants had issued factually baseless guidance and misled investors concerning student starts and revenue.  When the truth was revealed, shares of the Company fell about 20% on abnormally high trading volume to close at $16.30 per share from closing at $20.62 per share on August 4, 2010.    Thus, Defendants' disclosures had an immediate, adverse impact on the price of Lincoln stock.

101.    The decline in Lincoln's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of Lincoln's stock price decline negates any inference that the losses suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct.

### ADDITIONAL SCIENTER ALLEGATIONS

102.    As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Lincoln, their control over

and/or receipt and/or modification of Lincoln's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Lincoln, participated in the fraudulent scheme alleged herein.

103.    Defendants' misconduct relates to Lincoln's core operations.  Lincoln generates revenue through student starts and Lincoln's primary source of student start growth was ATB students prior to and during the Class Period.  Defendants monitored and tracked these enrollment rates and discussed them at length in both press releases and conference calls.  ATB enrollments formed the core of Lincoln's student start growth and were indicative of whether new DOE rules would negatively effect Lincoln's business in the future.  Accordingly, Defendant Carney as Executive Chairman and Chairman of the Board of Directors of the Company, Defendant McAlmont as President and Chief Executive Officer of the Company, and Defendant Ribeiro as Chief Financial Officer, Principal Accounting and Financial Officer, and Senior Vice President of the Company, are deemed to have knowledge of events concerning the ATB student start rates.

104.    Defendants' attempt to comply with the proposed DOE rules required Defendants to implement measures designed to reduce the ATB student start growth in order to decrease its ATB population after current ATB students concluded their Lincoln experience.  Defendants knew the impact that their actions would have on student start growth.  For example, Defendants' selection of a new ATB passing score/pass rate demonstrated Defendants' considered the impact of their measures to reduce ATB students.  Defendants conceded this fact when they disclosed the reasons for the student start growth shortfall.

105.    Defendant Carney was motivated to make materially false and misleading statements materially because it enabled him to sell $3,098,817 of his privately held Lincoln

shares during the Class Period, while in possession of materially adverse, non-public information about the Company.  The following are Defendant Carney's Class Period Lincoln trades:

| Buy(P) / Sell (S) | P/S date | Insider | Share Amt. | Unit Price | Total Proceeds | Shares Owned |
|---|---|---|---|---|---|---|
| S | 6/15/2010 | CARNEY DAVID F | 7,250 | $22.35 | $162,038.00 | 189,649 |
| S | 6/1/2010 | CARNEY DAVID F | 7,250 | $23.06 | $167,185.00 | 189,649 |
| S | 5/17/2010 | CARNEY DAVID F | 32,800 | $24.98 | $819,344.00 | 164,649 |
| S | 5/17/2010 | CARNEY DAVID F | 7,500 | $24.70 | $185,250.00 | 197,449 |
| S | 5/13/2010 | CARNEY DAVID F | 40,000 | $24.91 | $996,400.00 | 197,449 |
| S | 5/3/2010 | CARNEY DAVID F | 7,500 | $24.83 | $186,225.00 | 237,449 |
| S | 4/12/2010 | CARNEY DAVID F | 7,500 | $25.93 | $194,475.00 | 237,449 |
| S | 4/1/2010 | CARNEY DAVID F | 7,500 | $25.22 | $189,150.00 | 237,449 |
| S | 3/15/2010 | CARNEY DAVID F | 7,500 | $26.50 | $198,750.00 | 237,449 |

106.    Defendant Carney's trading in Lincoln was also suspicious and unusual in that during the Class Period, Defendant Carney made large sales of his holdings after the May 5, 2010 first quarter 2010 earnings release and conference call.  The sale of 40,000 shares on May 15, 2010, which grossed $996,400, and the sale on May 17, 2004, of 32,800 shares, which grossed $819, 334, were the largest blocks of shares sold by Defendant Carney within a year of the start of the Class Period.  Additionally, in 2009, Defendant Carney did not sell any shares

36

during the month of Lincoln's 2009 first quarter results.   The following are 12 months of Defendant Carney's pre-Class Period Lincoln trades:

| Buy(P) / Sell (S) | P/S date | Insider | Share Amt. | Unit Price | Total Proceeds | Shares Owned |
|---|---|---|---|---|---|---|
| S | 3/1/2010 | CARNEY DAVID F | 7,500 | $22.22 | $166,650.00 | 237,449 |
| S | 2/17/2010 | CARNEY DAVID F | 3,668 | $20.00 | $73,360.00 | 237,449 |
| S | 2/16/2010 | CARNEY DAVID F | 3,832 | $20.00 | $76,640.00 | 237,449 |
| S | 2/1/2010 | CARNEY DAVID F | 7,500 | $20.59 | $154,425.00 | 237,449 |
| S | 1/19/2010 | CARNEY DAVID F | 7,500 | $20.96 | $157,200.00 | 237,449 |
| S | 1/4/2010 | CARNEY DAVID F | 7,500 | $21.73 | $162,975.00 | 237,449 |
| S | 12/14/2009 | CARNEY DAVID F | 7,500 | $21.11 | $158,325.00 | 237,449 |
| S | 12/1/2009 | CARNEY DAVID F | 100 | $22.21 | $2,221.00 | 237,449 |
| S | 12/1/2009 | CARNEY DAVID F | 100 | $22.16 | $2,216.00 | 237,549 |
| S | 12/1/2009 | CARNEY DAVID F | 200 | $22.11 | $4,422.00 | 237,649 |
| S | 12/1/2009 | CARNEY DAVID F | 2,926 | $22.10 | $64,664.60 | 237,849 |
| S | 12/1/2009 | CARNEY DAVID F | 100 | $22.07 | $2,207.00 | 240,775 |
| S | 12/1/2009 | CARNEY DAVID F | 100 | $22.06 | $2,206.00 | 240,875 |
| S | 12/1/2009 | CARNEY | 573 | $22.01 | $12,611.70 | 240,975 |

| Buy(P) / Sell (S) | P/S date | Insider | Share Amt. | Unit Price | Total Proceeds | Shares Owned |
|---|---|---|---|---|---|---|
| | | DAVID F | | | | |
| S | 12/1/2009 | CARNEY DAVID F | 99 | $21.99 | $2,177.01 | 241,548 |
| S | 12/1/2009 | CARNEY DAVID F | 99 | $21.98 | $2,176.02 | 241,647 |
| S | 12/1/2009 | CARNEY DAVID F | 199 | $21.97 | $4,372.03 | 241,746 |
| S | 12/1/2009 | CARNEY DAVID F | 500 | $21.96 | $10,980.00 | 241,945 |
| S | 12/1/2009 | CARNEY DAVID F | 800 | $21.95 | $17,560.00 | 242,445 |
| S | 12/1/2009 | CARNEY DAVID F | 100 | $21.94 | $2,194.00 | 243,245 |
| S | 12/1/2009 | CARNEY DAVID F | 500 | $21.93 | $10,965.00 | 243,345 |
| S | 12/1/2009 | CARNEY DAVID F | 300 | $21.88 | $6,564.00 | 243,845 |
| S | 12/1/2009 | CARNEY DAVID F | 3 | $21.81 | $65.43 | 244,145 |
| S | 12/1/2009 | CARNEY DAVID F | 400 | $21.80 | $8,720.00 | 244,148 |
| S | 12/1/2009 | CARNEY DAVID F | 401 | $21.75 | $8,721.75 | 244,548 |
| S | 11/16/2009 | CARNEY DAVID F | 7,500 | $22.05 | $165,375.00 | 237,449 |
| S | 11/2/2009 | CARNEY DAVID F | 7,500 | $20.00 | $150,000.00 | 237,449 |
| S | 10/12/2009 | CARNEY DAVID F | 2,102 | $23.66 | $49,733.30 | 237,449 |

| Buy(P) / Sell (S) | P/S date | Insider | Share Amt. | Unit Price | Total Proceeds | Shares Owned |
|---|---|---|---|---|---|---|
| S | 10/12/2009 | CARNEY DAVID F | 200 | $23.65 | $4,730.00 | 239,551 |
| S | 10/12/2009 | CARNEY DAVID F | 100 | $23.64 | $2,364.00 | 239,751 |
| S | 10/12/2009 | CARNEY DAVID F | 317 | $23.55 | $7,465.35 | 239,851 |
| S | 10/12/2009 | CARNEY DAVID F | 444 | $23.53 | $10,447.30 | 240,168 |
| S | 10/12/2009 | CARNEY DAVID F | 220 | $23.52 | $5,174.40 | 240,612 |
| S | 10/12/2009 | CARNEY DAVID F | 3,700 | $23.51 | $86,987.00 | 240,832 |
| S | 10/12/2009 | CARNEY DAVID F | 100 | $23.50 | $2,350.00 | 244,532 |
| S | 10/12/2009 | CARNEY DAVID F | 100 | $23.49 | $2,349.00 | 244,632 |
| S | 10/12/2009 | CARNEY DAVID F | 100 | $23.48 | $2,348.00 | 244,732 |
| S | 10/12/2009 | CARNEY DAVID F | 117 | $23.43 | $2,741.31 | 244,832 |
| S | 10/1/2009 | CARNEY DAVID F | 7,500 | $22.87 | $171,525.00 | 237,449 |
| S | 9/14/2009 | CARNEY DAVID F | 7,500 | $21.50 | $161,250.00 | 237,449 |
| S | 9/1/2009 | CARNEY DAVID F | 7,500 | $21.72 | $162,900.00 | 237,449 |
| S | 8/17/2009 | CARNEY DAVID F | 7,500 | $22.15 | $166,125.00 | 237,449 |
| S | 7/20/2009 | CARNEY DAVID F | 7,500 | $20.00 | $150,000.00 | 237,449 |

| Buy(P) / Sell (S) | P/S date | Insider | Share Amt. | Unit Price | Total Proceeds | Shares Owned |
|---|---|---|---|---|---|---|
| S | 7/1/2009 | CARNEY DAVID F | 7,500 | $20.74 | $155,550.00 | 237,449 |
| S | 6/25/2009 | CARNEY DAVID F | 7,500 | $20.00 | $150,000.00 | 237,449 |
| S | 6/3/2009 | CARNEY DAVID F | 7,500 | $20.00 | $150,000.00 | 237,449 |

107.    Additionally, the Individual Defendants were motivated to fraudulently increase Lincoln's performance because of annual incentive bonuses.  According to Lincoln's Schedule 14(a) Proxy Statement filed May 23, 2010, in addition to base salaries, the Individual Defendants received payments in 2009 for: achieving net income goals   (Defendant Carney received $510,000, Defendant McAlmont received $450,000, and Defendant Ribeiro received $283,500); and exceeding revenue targets (Defendant Carney received $120,700, Defendant McAlmont received $106,500, and Defendant Ribeiro received $67,095).

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD-ON-THE-MARKET DOCTRINE**

108.    At all relevant times, the market for Lincoln's common stock was an efficient market for the following reasons, among others:

(a)    Lincoln's stock met the requirements for listing on, and was listed and actively traded on, the Nasdaq national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Lincoln filed periodic public reports with the SEC and the Nasdaq;

(c)     Lincoln regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Lincoln was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

109.   As a result of the foregoing, the market for Lincoln's stock promptly digested current information regarding Lincoln from all publicly-available sources and reflected such information in the price of Lincoln's stock.  Under these circumstances, all purchasers of Lincoln common stock during the Class Period suffered similar injury through their purchase of Lincoln common stock at artificially inflated prices and a presumption of reliance applies.

## **NO SAFE HARBOR**

110.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking

statement was false, and/or the forward-looking statement was authorized and/or approved by an

executive officer of Lincoln who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder against All Defendants

111.     Lead Plaintiff repeats and realleges each and every allegation contained above as

if fully set forth herein.

112.     During the Class Period, Defendants carried out a plan, scheme, and course of

conduct that was intended to and, throughout the Class Period, did:  (i) deceive the investing

public regarding Lincoln's business, operations, management and the intrinsic value of Lincoln's

common stock; (ii) enable Defendants to artificially inflate the price of Lincoln's shares; (iii)

enable Lincoln's insiders to sell millions of dollars of their privately held Lincoln's shares while

in possession of materially adverse, non-public information about the Company; and (iv) cause

Lead Plaintiff and other members of the Class to purchase Lincoln's common stock at artificially

inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants,

jointly and individually (and each of them) took the actions set forth herein.

113.     Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to misrepresent and/or conceal adverse material information about

the business, operations, and future prospects of Lincoln as specified herein.

114.     Defendants employed devices, schemes and artifices to defraud, while in

possession of materially adverse, non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Lincoln's value and

performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Lincoln and its business operations and future prospects in the light of the circumstances under which they were made not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Lincoln's common stock during the Class Period.

115.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.   Such Defendants' material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing Lincoln's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.

116.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lincoln common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Lincoln's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material, adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Lincoln common stock during the Class Period at artificially high prices and were damaged by the revelation of the true facts about Lincoln, its business and operations.

117.   At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Lincoln was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Lincoln's common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

118.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

119.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period and the revelation of the truth at the end of the Class Period.

### SECOND CLAIM

**Violation of Section 20(a) of
the Exchange Act against Individual Defendants**

120.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

121.   The Individual Defendants acted as controlling persons of Lincoln within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

44

decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

122.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

123.    As set forth above, Lincoln and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts, statements, and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated:  February 14, 2011

**JAN MEYER & ASSOCIATES, P.C.**

s/ Solomon Rubin
Jan Meyer
Solomon Rubin
1029 Teaneck Road, 2nd Floor
Teaneck, NJ  07666
Phone:  (201) 862-9500
jmeyer@janmeyerlaw.com
srubin@janmeyerlaw.com

*Local Counsel for Lead Plaintiff*
*and the Class*

**BERNSTEIN LIEBHARD LLP**
Jeffrey M. Haber
Michael S. Bigin
10 East 40th Street, 22nd Floor
New York, NY  10016
Phone:  (212) 779-1414
haber@bernlieb.com
bigin@bernlieb.com

*Lead Counsel for Lead Plaintiff*
*and the Class*