<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE LINCOLN EDUCATIONAL SERVICES CORP. SECURITIES LITIGATION | : : : : | |
| | : | **Civil Action No. 10-460 (SRC)** |
| | : : | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | : : : : | **OPINION** |

<u>**CHESLER**</u>, District Judge

This matter comes before the Court on Defendants' motion to dismiss the Consolidated Amended Class Action Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). Lead Plaintiff Richard Arons ("Plaintiff") has opposed the motion. The Court has considered the papers filed by the parties and, pursuant to Federal Rule of Civil Procedure 78, will rule on the motion without oral argument. For the reasons expressed below, Defendants' motion will be granted.

## I. BACKGROUND

This is a securities fraud case, filed as a putative class action on behalf of shareholders who bought the common stock of Defendant Lincoln Educational Services Corp. ("Defendant" or "Lincoln") between March 3, 2010 and August 4, 2010, inclusive (hereinafter, the "Class

Period"). The essence of the fraud alleged is that Lincoln and individuals employed by Lincoln misled investors concerning how the implementation of certain reforms to its admissions standards and protocols would affect the student enrollment growth rate projected by Lincoln for 2010. The individuals named as Defendants in the Complaint are David Carney (Chairman of Lincoln's Board of Directors during the Class Period), Shaun McAlmont (Lincoln's President and Chief Executive Officer) and Cesar Ribeiro (Lincoln's Senior Vice President and Chief Financial Officer).

Before turning to the alleged misrepresentations on which the instant legal action is based, the Court will review pertinent facts about Lincoln's business and the relevant changes to its admissions standards. The Court bases the following narration solely on the Complaint's factual allegations, which are assumed to be true for purposes of this motion only.

Lincoln is classified by the Department of Education ("DOE") as a "for-profit" school. The Complaint describes for-profit schools as follows:

> For-profit schools offer students certificates and/or degrees after preparing them for employment in a trade. These schools typically receive a large amount of their tuition payments from federal financial aid. Accordingly, for-profit schools are subject to regulation by the U.S. Government, which can prohibit students receiving federal financial aid from attending a for-profit school that does not meet the Government's requirements.

(Compl., ¶ 3.) Lincoln's 2009 SEC Form 10-K stated that approximately 81% of Lincoln's revenue is derived from federal financial aid funds pursuant to Title IV of the Higher Education Act. (Id., ¶ 30.)

Some students who enroll at Lincoln have not graduated high school. (Id., ¶¶ 35, 38.) The DOE and Lincoln classify such students, meaning those who are admitted to secondary

2

education programs without a high school diploma, as "ability to benefit" ("ATB") students. (Id., ¶ 36.)  Statistically, ATB students are less likely to complete their program, become gainfully employed and/or pay back student loans.  (Id., ¶ 37.)  DOE regulations thus cap the number of ATB students which may be admitted to a school subject to the DOE's jurisdiction. (Id.)  Under the regulations, ATB students may not constitute 50% or more of the student body. (Id.)  In 2009, ATB students accounted for approximately 11% to 12% of Lincoln's total student population.  (Id., ¶¶ 38, 55.)

In October 2009, the DOE published proposed new regulations, which in relevant part would deny Title IV funds to schools that failed to prepare their students for "gainful employment," a standard measured by various factors, including a school's average student loan debt and repayment rate and program completion by students. (Id., ¶¶ 31-34.)  According to the Complaint, the DOE recognized that debt loads and defaults had grown rapidly at for-profit schools as a result of the failure to position students to earn enough to pay their obligations. (Id., ¶ 34.)  The proposed rule aimed to hold for-profit schools accountable for preparing students for gainful employment, so that the students would be able to pay back their federal loans. (Id.)  In anticipation of the rule change, Lincoln decided to limit its enrollment of ATB students, with the alleged goal of making it easier to comply with the DOE's proposed regulations regarding the preparation of students for gainful employment and the reduction of debt and loan defaults. (Id., ¶¶ 44-45.)

On March 3, 2010, Lincoln issued an Earnings Release, which contained year-end results for 2009 as well as revenue and student start rate growth projections for 2010.  (Id., ¶ 42.)  The release stated that for 2010, Lincoln would experience an "increase in expected student starts of

13% to 15% over 2009." (<u>Id.</u>, ¶ 67.) On that date, Lincoln also held a conference call with investors (hereinafter, the "March 3 conference call"). (<u>Id.</u>, ¶¶ 43, 72.) During the March 3 conference call, Lincoln announced that the company was raising its admissions standards to reduce the school's population of ATB students. (<u>Id.</u>, ¶ 73.) In particular, Defendants Carney and McAlmont stated that Lincoln had increased its required test scores for ATB students and had begun requiring a pre-admission and orientation program. (<u>Id.</u>, ¶ 44). Carney reiterated the student growth start projection announced in the press release, and McAlmont explained that, in spite of the tightened ATB student entrance requirements, Lincoln believed that a loss in the ATB student portion of the population would be offset by an increase in students who had graduated from high school. (<u>Id.</u>, ¶¶ 43, 73.) He stated:

> I will just say that our approach on looking at entrance requirements is a gradual one. We look at offsetting and so if we tighten our entrance requirements, it may, for example, affect ATB students and lessen that population over time. But we offset that with an increase in our recent high school grad population. And we feel that that particular offset gives us better outcomes, a student that is more committed and it really does relieve the burden on some of our entrances processes.

(<u>Id.</u>, ¶ 73.)

A couple of months later, on May 5, 2010, Defendants issued a press release reporting on results for the first quarter of 2010. It stated that Lincoln had met projected revenue and student start rate growth for the quarter. The press release reiterated the expected overall student start increase for 2010 and also stated that the expected student start increase for the second quarter was 8% to 10%. (<u>Id.</u>, ¶¶ 47, 49, 75.) Commenting on the results during a May 5, 2010 conference call (hereinafter, the "May 5 conference call"), Defendant Carney stated:

> Our strong student starts during the last several quarters has led us to take
> a more selective approach to our admissions standards.  We expect these
> actions will reduce our start growth over time, but improve retention,
> student outcomes, and placement rates as well as ultimately reduce bad
> debt expense and default rates.  We implemented these efforts at the
> beginning of the year and therefore factored them in to our 2010 outlook
> that we provided on our March 3 earnings call.

(Id., ¶ 50.)  Later in the call, Defendant McAlmont reassured investors that the new approach to

reduce ATB student enrollment "has already been implemented" and further reassured that there

were "no other changes to admission standards."  (Id., ¶ 81.)

According to the Complaint, the truth about student starts was revealed on August 5,

2010.  Before the trading day began, Lincoln issued a press release which reported that for the

second quarter, "student starts were essentially flat and reflected actions to raise outcomes."  (Id.,

¶ 86.)  The press release quoted McAlmont as stating that in light of the ATB student admissions

reforms, "we now believe student starts will be essentially flat for the remainder of 2010."  (Id.)

Plaintiff alleges that, during the August 5, 2010 conference call, "Defendants revealed for the

first time that two thirds of student start growth for the second quarter was expected to come

from ATB enrollments, that ATB enrollment remained at 11% and that high school enrollments

did not materialize." (Id., ¶ 89.)  Both Carney and McAlmont represented during the conference

call that the ATB student admissions reforms would limit new student start growth in "the short-

term."  (Id., ¶¶ 87, 88.)  Moreover, McAlmont told investors that there would be a start rate

impact "while we implement [restrictions on ATB enrollments]." (Id.,¶ 89 (alteration in

Complaint).)  The Complaint alleges that as a result of the revelations of August 5, 2010,

Lincoln's stock price fell approximately 20%, as the market incorporated the information that

Lincoln's actions to limit ATB student admissions were likely to stunt the school's student starts for the rest of the year and thus would have a negative effect on Lincoln's business.  (Id., ¶ 92.)

According to the Complaint, the statements made on March 3, 2010 and May 5, 2010 regarding student starts were materially false and misleading because Defendants knew or recklessly disregarded that Lincoln would be unable to achieve its full year and second quarter start rates while simultaneously implementing measures to reduce enrollment of ATB students. (Id., ¶ 76.)  Plaintiff alleges that Lincoln concealed from investors that it largely depended on ATB student start growth to achieve overall student start growth.  (Id., ¶ 77.)  Plaintiff further avers that Carney's representations that the effects of such measures had been incorporated into the projections were also false.  (Id., ¶ 78.)  Finally, the Complaint also alleges that Defendants made material misrepresentations when they stated that the admissions reforms would affect student start rates "over time" and when they stated that the reforms had already been implemented.  (Id., ¶¶ 87-88, 90.)

Plaintiff seeks relief under § 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b).  He also asserts a claim against the Individual Defendants for control person liability, pursuant to Exchange Act § 20(a), 15 U.S.C. §78t(a).


II.   DISCUSSION

A.   Standard of Review

The issue before the Court on a Rule 12(b)(6) motion to dismiss "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).   To make that determination, the Court must employ the standard of review articulated by the Supreme Court in Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal.  A complaint will survive a motion under Rule 12(b)(6) only if it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).  The plausibility standard will be met if the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556.)  While the complaint need not demonstrate that a defendant is *probably* liable for the wrongdoing to meet the pleading standard of Federal Rule of Civil Procedure 8(a), allegations that give rise to the mere *possibility* of unlawful conduct will not do.  Iqbal, 129 S.Ct. at 1949; Twombly, 550 U.S. at 557.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes certain heightened pleading requirements on claims brought pursuant to Exchange Act § 10(b) and the statute's implementing regulation Securities and Exchange Commission ("SEC") Rule 10b-5. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320-21 (2007) (noting that prior to the enactment of the PSLRA, the pleading standard of Rule 9(b) governed the sufficiency of a complaint for securities fraud). To survive a motion to dismiss, the complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(1) & (2); 15 U.S.C. § 78u-4(b)(3)(2) ("In any

7

private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of [15 U.S.C. §§ 78u-4(b)(1) & (2)] are not met.").

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must consider the complaint in its entirety.  Tellabs, 551 U.S. at 322.  It is also proper to consider "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice." Id.

**B.    Exchange Act Securities Fraud Claim**

Under § 10(b) of the Exchange Act, a person or entity may not "use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b).        SEC Rule 10b-5(b), in turn, makes it unlawful to "make any untrue statement of material fact or to omit to state a material fact in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  A private cause of action for damages sustained as the result of a violation of Section 10(b) and Rule 10b-5 requires the plaintiff to establish the following six elements:

> (1) a material misrepresentation or omission;
>
> (2) scienter, i.e., a wrongful state of mind;
>
> (3) a connection with the purchase or sale of a security;
>
> (4) reliance, also known as "transaction causation" in cases involving public securities markets;
>
> (5) economic loss; and

8

(6) loss causation, i.e., a causal connection between the material

misrepresentation and the loss.

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); see also McCabe v. Ernst & Young,

LLP, 494 F.3d 418, 424 (3d Cir. 2007).

Defendants' motion to dismiss focuses on the first element of the claim. They argue that

none of the allegedly misleading statements may constitute a misrepresentation of material fact as

a matter of law because they are forward-looking statements that fall into the PSLRA's safe

harbor provision.

The PSLRA carves out a category of statements that will not be actionable, provided

certain conditions are met.  See 15 U.S.C. § 78u-5.  Summarizing the statutory conditions, the

Third Circuit held that, under the safe harbor provision, "forward-looking statements" are not

actionable "provided that they are (1) identified as such, and accompanied by meaningful

cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the

statement was false or misleading." In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 278-79 (3d Cir.

2010); see also 15 U.S.C. § 78u-5(c).  By immunizing certain oral and written statements that

"describe, project, or estimate future events," Congress sought to "enhance market efficiency by

encouraging companies to disclose forward-looking information" to investors. S. Rep. No. 104-

98, at 14-15 (1995).

The threshold question, then, is whether the alleged misrepresentations at issue fall within

the statutory definition of "forward-looking statement." The PSLRA's safe harbor provision

provides as follows:

The term "forward-looking statement" means –

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1)(A)-(F).

The core of this action involves statements containing projections of the anticipated growth rate of new student enrollment at Lincoln. All of the allegedly offending statements made in the press releases and conference calls of March 3, 2010 and May 5, 2010 deal with the predicted effect of Lincoln's ATB student admissions reforms on the company's student starts and revenue. Defendants projected student start growth rates for the second quarter of 2010 and for 2010 overall, representing that they had factored the admissions reforms into their projections. Defendants also represented that, while they recognized that stricter ATB student admissions requirements would reduce the ATB student population – indeed, this was a goal of

10

the reforms –  they "expect[ed]" that the enrollment of high school graduate students would offset those losses.   Plaintiff, in short, bases his claim on classic forward looking statements, which clearly fall within the broad statutory definition of that term.  See, e.g., Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 255 (3d Cir. 2009) (discussing breadth and applicability of safe harbor provision).

        As briefly discussed above, such statements are not actionable in certain circumstances. Relevant to this motion, the safe harbor provision states that forward-looking statements are protected if they are "identified as forward looking and are 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" Avaya, 564 F.3d at 256 (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).  Additionally, regardless of cautionary language, forward-looking statements are not actionable if they are immaterial.  15 U.S.C. § 78u-5(c)(1)(A)(ii).

        Plaintiffs do not dispute that each of the press releases and conference calls in which the allegedly fraudulent statements were made noted that they contained forward-looking statements. They do, however, argue that the warnings given by Defendants failed to provide meaningful cautionary language which is essential to bring the forward-looking statements within the PSLRA's safe harbor.  Under Third Circuit law, "cautionary language must be extensive and specific." Avaya, 564 F.3d at 256 (quotations omitted).  To be meaningful, it "must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." Id.   This argument lacks merit, as the record amply demonstrates that in the very same conference calls in which they discussed the allegedly misleading growth start projections, Defendants tempered their projections with cautionary language specifically advising

of the reduction in ATB enrollment and the likelihood that more stringent entrance requirements

would have a short-term effect on the student start growth rate.   The May 5 conference call, for

example, contained the following statement by Defendant McAlmont:

> Yeah, we've essentially increased our entrance test standards for ATB
> students at various schools, and we've also restricted ATB enrollment in
> some associate degree programs.  And we agree it just makes good sense.
>
> **We do think it will have some short-term impact on start growth as
> Cesar mentioned – we all mentioned in our comments**; however, we
> feel the benefits really are meaningful in completion placement and default
> rates over time.
>
> As Dave mentioned earlier, we're really trying to eliminate the highest risk
> students from our populations ultimately.  Our ATB rate throughout last
> year was about 12%, today, it's just at 11, and that will continue to come
> down.

(May 5 Conf. Call Tr. at 6-7) (emphasis added).  The cautionary language was tailored to the

projection on which Plaintiff's securities fraud claim is based and expressly warned of the risk

that materialized in this case when the actual start growth for the 2010's second quarter failed to

hit the projected mark.  It is clear that Defendants' forward-looking statements regarding the

expected student growth rate come within the PSLRA's safe harbor and therefore are not

actionable.  15 U.S.C. § 78u-5(c)(1)(A)(i).

   Plaintiff attempts to negate the effect of this cautionary language by arguing that

Defendants sent mixed messages about whether student start growth would slow immediately or

in the long-run.  In particular, Plaintiff points to a statement made by Defendant McAlmont in

the March 3 conference call expressing the view that the tightened ATB entrance requirements

may "lessen that population over time." (Mar. 3 Conf. Call Tr. at 11.)  Reading the entire

comment made by McAlmont, however, reveals that his statements did not concern the subject of

the new student enrollment growth rate at all.  The question posed by an analyst and McAlmont's

response were as follows:

> PAUL CONDRA: Thank you.  And just one more.  When you spoke about
> these entrance requirements that you are considering implementing for
> some of your courses, do you have any more detail about that?  Is there
> any kind of timeline or what students might be affected by that?

> SHAUN MCALMONT: I will just say that our approach on looking at
> entrance requirements is a gradual one.  We look at offsetting and so if we
> tighten our entrance requirements, it may, for example, affect ATB
> students and lessen that population over time.  But we offset that with an
> increase in our recent high school grad population.  And we feel that that
> particular offset gives us better outcomes, a student that is more
> committed and it really does relieve the burden on some of our entrance
> processes.  And so you'll probably hear more from us in coming calls on
> that process.

(Id.)  No reasonable investor could construe such a statement as communicating the message that

Plaintiff has tried to create –  that Defendants assured that ATB student admissions reforms

would affect Lincoln's student start growth rate over time.  McAlmont's March 3 statement

concerns the ATB student population, but statements about the anticipated (indeed deliberate)

reduction of ATB students in Lincoln's overall student body are not the subject of Plaintiff's

securities fraud claim.  Logically, imposing stricter admissions standards could have an

immediate effect on ATB student starts – thus, the express warning regarding short-term effects

on start growth – but would not immediately thin out the school's entire population of ATB

students.  Plaintiff makes a futile attempt to render Lincoln's cautionary language confusing and

thus ineffective.

    Plaintiff also takes issue with Defendants' prediction about offsetting enrollments by high

school students.  Defendant McAlmont stated: "[W]e feel that sort of the offsetting event here is

the focus on our high school students and high school recruitment." (May 5 Conf. Call Tr. at 7.)
He also asserted: [W]e feel that that continued focus on the high school side will offset some of
the short-term — sort of loss of start growth on the ATB side." (Id.)  Plaintiff, it seems,
persistently tries to create misleading statements by confusing the subjects of the ATB
admissions reforms' effect on student start growth projections and their anticipated role in
changing the makeup of Lincoln's student body.   The transcript of the conference call shows that
these "offset" statements were made immediately following the reiteration that Lincoln was
"really trying to eliminate the highest risk students from our population ultimately" and the
statement that the ATB portion of the population "will continue to come down."  (Id.)  In fact,
they were made in the same response by McAlmont in which he specifically warned of "short-
term impact on start growth."  (Id.)  Moreover, Defendants' forward-looking statements about
offsets amount to no more than immaterial statements about what Defendants were hopeful
would happen.   The test of materiality in the context of § 10(b) and Rule 10b-5 examines
whether the representation "significantly altered the 'total mix' of information made available."
Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  In contrast, "statements of subjective
analysis or extrapolations, such as opinions, motives and intentions, or general statements of
optimism" are generally immaterial.  Aetna, 617 F.3d at 283. The Third Circuit has repeatedly
observed that such statements amount to no more than "puffery" and would be recognized
accordingly by reasonable investors, such that the "total mix" of information would not be
affected.  Id.  Defendants' "offset" statement, even assuming it could be construed to pertain to
student start figures, expressed no more than a general and optimistic belief that the overall
impact of the loss of ATB students would be lessened by the company's focus on recruiting high

school students.  Plaintiff does not allege that Defendants communicated any concrete information about the expected increase in high school student starts, and the record does not reflect any such specific information.  The purportedly misleading statement about high school student offsets is immaterial as a matter of law because it amounts to no more than Defendants' vague expressions of hope.  In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1427-28.  Accordingly, it falls squarely within the safe harbor provision and is not actionable. 15 U.S.C. § 78u-5(c)(1)(A)(ii); Aetna, 617 F.3d at 283.

Plaintiff attempts to breathe life into this securities fraud action by arguing that Defendants' growth rate projections were materially misleading because they concealed from investors the fact that the projected figures relied heavily on ATB student starts and thus failed to meaningfully warn of the risk that the predicted growth rate might not materialize.  According to Plaintiff's opposition brief, Defendants' student start growth rate figures for 2010 are not forward-looking statements immunized from § 10(b) liability because Defendants failed to warn that two thirds of the projected enrollment growth was based on enrolling more ATB students.  (Opp. Br. at 29.)  This argument appears to be rooted in the Complaint's allegation that during the August 5 conference call, "Defendants revealed for the first time that two thirds of student start growth for the second quarter was expected to come from ATB enrollments, that ATB enrollment remained at approximately 11%, and that high school enrollments did not materialize."  (Compl., ¶ 89.)  This allegation does not, however, accurately reflect the information disclosed during the conference call.  The transcript reflects that, in response to an analyst's question asking him to explain the lower student starts versus the company's expectations, Defendant McAlmont stated as follows:

15

> Like I said in my comments, the ATB students or the higher-risk portion of the ATB students affected probably two thirds of that shortfall. I think the ATB students as a percent of total will come down over time, as we said in prior calls. We just haven't quantified what that will be over the next few quarters, and we'll give more indication of that on future calls.
>
> But I think part of the shortfall, as I mentioned earlier, was affected by affordability, and to the extent of probably one third. And this may be a timing issue as some families are taking a slightly longer time to decide on when to start and looking at their financing options . . .

(Aug. 5, 2010 Conf. Call. Tr. at 12.) McAlmont's comments do not support Plaintiff's assertion that Lincoln misled investors by failing to disclose that two thirds of the start growth for 2010 was based on ATB starts, which the admissions reforms were designed to reduce. Rather, a common sense reading of his comments reflects that he was explaining the perceived cause of the shortfall between the projected second quarter student start growth rate of 8% and the actual lack of growth experienced during the quarter. Reading McAlmont's statement in the context of the conference call and the question he specifically answered, the statement would appear to reflect his assessment of the reasons why the actual student start growth rate missed the projected mark - in part, due to the stricter ATB admissions requirements and in part due to prospective students' inability to afford the tuition. In other words, it appears to be explanatory of past events, not revelatory of some previously undisclosed assumption underlying the second quarter growth projection. Though Plaintiff purports to extrapolate from McAlmont's comments a theory that cautionary language regarding the projected growth rate was meaningless because Defendants concealed material information about the basis of the projection, his allegation contradicts the source document. As such, the Court need not, and will not, accept this allegation as true. See Maio v. Aetna, Inc., 221 F.3d 472, 485 n.12 (3d Cir. 2000) (noting that, under established Third

16

Circuit law, it "need not accept as true unsupported conclusions and unwarranted inferences" and that it thus properly evaluated the sufficiency of a complaint by considering its factual allegations together with the materials in which the defendants' alleged misrepresentations were made).

The cautionary statements made by Defendants go straight to the core of the subject matter of the allegedly misleading projections. The complained-of misrepresentations revolve around the predicted effect of Lincoln's stricter ATB student admissions standards, whether expressed as a projection of the student start growth rate, an expectation that increased high school student enrollment would offset the decreased ATB student enrollment, or an estimate of the timeframe in which such impact would be felt. Defendants expressly warned that the reforms were designed to reduce the ATB student population and would have an impact on student starts.

Perhaps in recognition of the futility of a securities fraud claim based on classic forward-looking statements accompanied by clear and meaningful cautionary language, Plaintiff pins his hopes on two isolated snippets of commentary made by Defendants about implementation of the ATB admissions reforms. Both statements were made during the May 5 conference call. The Complaint sets forth that Defendant Carney, in his prepared remarks, communicated the following: "We *implemented* these efforts at the beginning of the year and therefore factored them into our 2010 outlook that we provided on our March 3 earnings call." (Compl., ¶ 50) (emphasis added). Later in the call, McAlmont answered an analyst's question about whether confirmed that no further admission reforms would be made from the second to third quarters. The colloquy went as follows:

17

> Q: [J]ust one more follow-up on the second quarter to third quarter stats, will you be doing anything differently between those two quarters with regard to new admission standards?
>
> A: [McAlmont] No.
>
> A: [Carney] No.
>
> A: [McAlmont] I think everything we've talked about *has already been implemented and no other changes to admissions standards*. I think the only thing that we'll see internally is a more aggressive approach in our high school marketing process that – those in-school efforts and also the high school media efforts as well.

(Tr. of May 5, 2010 Conf. Call. at 13) (emphasis added).[1] Plaintiff contrasts these statements with McAlmont's comment during the August 5 conference call in which he explained that "*while we implement* [the new admissions standards], we feel that there will be a start rate impact as we experienced in Q2, and we're forecasting that for the remainder of the year." (Tr. of Aug. 5, 2010 Conf. Call at 9) (emphasis added). He tries to fabricate a cause of action based on these statements in two ways. First, he argues that the representations made on May 5 were not forward looking, and thus not are protected by the PSLRA's safe harbor, because they communicated information about the then-current status of the reforms. Second, he argues that they were misleading as to a material fact because they represented that the changes to admissions standards had already been made when they were actually, according to the Complaint's characterization, "still being implemented." (Compl., ¶ 84.) For the following

---

[1] The Complaint quotes an excerpt of this portion of the conference call but omits the relevant question to which McAlmont was responding, without which the context and meaning of McAlmont's statement cannot be understood. Defendants submitted with their motion a transcript of the conference call. The Court has properly considered the transcript, though extraneous to the Complaint, because the conference call and its contents are expressly referred to and relied upon in the Complaint.

reasons, these arguments fail.

First, Plaintiff's approach isolates certain words or comments from the rest of Defendants' remarks about the start growth projections and then imposes a contrived gloss on them to take them out of the safe harbor.  To the point, a common sense reading of the May 5 statements about the already implemented reforms does not support Plaintiff's argument that Defendants were making a false assertion about past events.  Indeed, there is no dispute that Lincoln's entrance requirements for ATB students were in fact made more stringent.  Rather, as Carney's statement clearly and expressly communicates, Defendants represented that the student start growth projections had taken the admissions reforms and their anticipated impact into account (the changes had been "factored into" the projections).  His remark about the already implemented reforms falls squarely into the safe harbor provision's express inclusion in the definition of "forward-looking statement" of any statements which concern assumptions underlying a projection of future economic performance and/or financial condition.  See 15 U.S.C. § 78u-5(i)(1)(D).  Likewise, McAlmont's statement, read in context, merely assures that no additional admissions changes would be adopted by Lincoln in the near future, particularly in the timeframe between the second and third quarters of 2010.  He was responding to an analyst's request for clarification regarding a critical assumption of the student start growth projections released by the company, and thus McAlmont's statement concerning that assumption – that the expected impact of the adopted reforms had been factored into the growth projection – is also a forward-looking statement under the safe harbor provision.

Second, whether deemed forward-looking statements or, as Plaintiff urges, characterized as representations about a past event, the remarks about the implementation of the reforms fail to

give rise to a securities fraud claim for lack of materiality. To violate Rule 10b-5, a statement or omission must be *"misleading* as to a *material* fact." Basic, 485 U.S. at 238 (emphasis in original). Plaintiff attempts to cast McAlmont's "while we implement" statement, made in the August 5 conference call, as a corrective disclosure, that is, a statement that reveals the falsity of a prior material misrepresentation. McCabe v. Ernst & Young, LLP, 494 F.3d 418, 425-26 (3d Cir. 2007). There is no indication, much less a "substantial likelihood", that a semantic difference in language about the implementation of reforms "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, 485 U.S. at 231-32. In other words, there is no material difference between the earlier statements, which asserted that the new admissions standards had already been implemented, i.e. adopted, and the subsequent "revelation" that the admissions standards were being implemented, i.e. applied. Indeed, they would appear to be entirely consistent, confirming that Lincoln tightened ATB student admissions as it said it would. Morever, McAlmont's August 5 "while we implement" statement, if anything, continues to repeat the same cautionary message that Lincoln had previously communicated, that is, that the admissions reforms would likely affect student start growth.

In short, the fraud alleged in this case stems from Defendants' projections about Lincoln's student start growth. For the reasons discussed, Defendants' alleged misrepresentations are forward-looking statements immune from liability under the PSLRA's safe harbor provision. Plaintiff cannot salvage this action by snipping selective words from conference calls and manipulating them in a way that would suggest that a material falsehood was communicated to investors. Based on the allegations of the Complaint and the materials containing the allegedly

misleading statements on which Plaintiff's securities fraud claim is based, the Court concludes that Plaintiff has failed to state a claim for relief under Exchange Act § 10(b).  Defendants' motion to dismiss this claim pursuant to Rule 12(b)(6) will accordingly be granted.

### C.    Control Person Claim

Defendants have also moved to dismiss the control person claim asserted in the Complaint against Defendants McAlmont, Carney and Ribeiro. Section 20(a) of the Exchange Act "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of § 10(b)."  Avaya, 564 F.3d at 252; see also 15 U.S.C. §78t(a).  A Section 20(a) claim thus imposes secondary liability on the controlling person for the wrong committed by the one who is controlled.  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284-85 (3d Cir. 2006).  Plaintiff's control person claim is predicated upon Defendant Lincoln's primary liability under § 10(b).  Defendants argue that because Plaintiff fails to state an actionable § 10(b) violation against Lincoln, his control person claim necessarily fails to state a claim upon which relief may be granted.  Defendants are correct.  Id. at 285; Shapiro v. UJB Financial Corp., 964 F.2d 272, 279 (3d Cir. 1992) (holding that "once all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based.").   Accordingly, the control person claim will also be dismissed for failure to state a claim upon which relief may be granted.

**III.**    **CONCLUSION**

For the foregoing reasons, the Complaint will be dismissed in its entirety pursuant to

Federal Rule of Civil Procedure 12(b)(6).  An appropriate form of Order will be filed.


                                                   s/ Stanley R. Chesler
                                             STANLEY R. CHESLER
                                             United States District Judge


Dated: September 6, 2011